**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. AZ-18-1317-LBF |
| PEORIA REGIONAL MEDICAL CENTER, LLC, | Bk. No. 2:17-bk-11742-SHG |
| Debtor. | |
| NAT PALANIAPPAN, a/k/a Raj Palaniappan, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| PEORIA REGIONAL MEDICAL CENTER, LLC, | |
| Appellee. | |

Argued and Submitted on July 18, 2019
at Phoenix, Arizona

Filed – August 2, 2019

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Scott H. Gan, Bankruptcy Judge, Presiding

---

Appearances:     Appellant Nat Palaniappan argued pro se; Heather Macre of Aiken Schenk Hawkins & Ricciardi P.C. argued for Appellee.

---

Before: LAFFERTY, BRAND, and FARIS, Bankruptcy Judges.

**INTRODUCTION**

Appellant Nat Palaniappan entered into a prepetition employment contract ("MOU") with Peoria Regional Medical Center, LLC ("PRMC") to act as its CFO and to obtain financing to complete construction of a hospital on real property owned by PRMC. After PRMC filed its chapter 11[1] petition, it terminated Mr. Palaniappan's employment. Mr. Palaniappan filed a claim for severance pay under the MOU. After a hearing, the bankruptcy court entered an order disallowing Mr. Palaniappan's claim for severance pay and ruling that under the MOU he was entitled to compensation of only $15.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

Finding no error in the bankruptcy court's interpretation of the MOU, we AFFIRM.

## FACTUAL BACKGROUND

PRMC was formed in 2007 to own real property in Peoria, Arizona (the "Property") on which a hospital would be built and operated. PRMC began construction, but it ran out of money in 2012. PRMC's management sought outside financing to complete the construction, and PRMC's manager, Timothy A. Johns, M.D. engaged Mr. Palaniappan to help find financing.

In March 2017, Mr. Palaniappan drafted, without the assistance of legal counsel, a document entitled "AGREEMENT FOR NORTH WEST MEDICAL CENTER DBA PEORIA REGIONAL MEDICAL CENTER." Dr. Johns reviewed the document and made several changes to it, including changing the word "AGREEMENT" to "MOU" (memorandum of understanding). Dr. Johns then initialed and dated the MOU.

The MOU provided that "CFO Mr. Palaniappan N." would be responsible for procuring construction financing, working capital and equipment financing and overseeing all fiscal and fiduciary responsibilities for the "organization." Additionally, he was to lead the finance department and oversee "Information Systems, Banking Relationships and Patient Financial arrangements."

Paragraph 1 of the MOU provided, somewhat confusingly, that

Mr. Palaniappan would be paid "$1 per month pre loan procurement may be canceled with 30 days written [sic] if foreclosed by New Vision Health or City mandate. Equity shares will be offered instead of Compensation." The MOU provided for "post loan funding and commencement of construction compensation" of $100,000 annually plus health insurance, to be increased upon the occurrence of certain events.

The MOU contained two alternative severance provisions, which depended upon the procurement of financing and the party who procured it. Specifically, if Mr. Palaniappan procured financing,

> [a]t the end of employment? [sic] as agreed upon by the Board of Directors, Investors and Operating Manager for any reason other than malfeasance, at the time of separation, you will be provided with separation package of one year's current salary and keep [sic] any equity shares issued to you, unless you are CFO of NWMC/PRMC plus an additional hospital where Tim Johns is manager, your severance will be one year of the current salary you are receiving for your dual role.

Alternatively, if Dr. Johns secured funding, and Mr. Palaniappan was terminated for any reason,

> severance will be the sum total of 9 months of the 185,000 or any current salary whichever is highest and any equity shares assigned to Mr. Palaniappan. N. [sic]

No financing was secured, and on August 30, 2017, the City of Peoria issued a notice to abate code violations at the Property, setting a deadline of September 27, 2017 for PRMC to obtain a permit to demolish the

partially constructed structure. As this apparently did not occur, on October 3, 2017, the City of Peoria notified PRMC of its intent to demolish the structure immediately. Around the same time, secured creditor Gilbert Hospital began foreclosure proceedings on its note secured by a deed of trust against the Property.

PRMC filed a chapter 11 petition on October 4, 2017.

Dr. Johns terminated Mr. Palaniappan's employment with PRMC in May 2018.[2] In July 2018, PRMC filed a motion to approve a sale of the Property to ADB Investments, LLC, subject to overbid. The terms of the sale included a right of first offer to PRMC to rent space in the hospital building to be constructed on the Property. Mr. Palaniappan objected to the sale on the grounds that he was owed an administrative claim pursuant to the MOU, specifically, a separation package, health insurance, equity shares in the hospital, and compensation for "lost fees from not accepting comprehensive overseas funding." He also filed a motion for relief from stay to permit him to go to state court to adjudicate the amount of his claim.

At the hearing on the sale motion, the court explained to

---

[2]The parties seem to disagree on the exact date of termination. PRMC asserts that Dr. Johns sent Mr. Palaniappan a "termination email" on May 3, 2018. In his appellate brief, Mr. Palaniappan contends he was served a formal notice of termination on August 30, 2018, and at oral argument in the bankruptcy court he disputed that he was terminated in May 2018, but in his motion for relief from stay he stated he was "terminated abruptly" in May 2018.

Mr. Palaniappan that the issue before the court was whether it should approve a sale that would pay the liens and taxes on the Property and that Mr. Palaniappan's entitlement to payment of a claim was not a basis to disapprove the sale. The court overruled his objection and approved the sale. The court then stated:

> What I wanted to explain is that, if you think you have a claim, which you've seemingly started to assert in this case, you need to file an application to be paid as an administrative expense claimant in this case. It needs to set forth not just the reasons why you think you could be paid, but also what amount you believe is an administrative expense of this estate and why. You need to file it, and you need to serve it in accordance with the rules.
>
> Then Ms. Macre [PRMC's counsel] will have an opportunity to object, and then we'll set some kind of a hearing if necessary to either argue the merits or to determine what the next step will be. I would suggest that you hire someone to help you. I can't make you go out and get someone and I don't know whether you can financially afford it, but it would be of significant assistance to you to have someone work with you to help you prepare this and get it on file.

On September 20, 2018, Mr. Palaniappan filed a proof of claim listing an unsecured claim of $138,750 with the notation "+ * Equity Shares in P.R.M.C./N.W.M.C. Peoria or Proxy[.]" He listed "separation and severance package" as the basis for the claim. He did not attach the MOU to his proof of claim, but he did attach it to his concurrently filed "Motion to Set

Hearing on Severance Claim Due to Plaintiff," asserting that the basis for the claim was the MOU. In that motion, he requested an evidentiary hearing "if Court felt [sic] it is necessary."

PRMC filed an opposition, asserting that the MOU was not enforceable, and in any event, no events had occurred that triggered the severance provisions. Alternatively, PRMC argued that Mr. Palaniappan was entitled under the MOU to no more than $15.

At the hearing on the severance claim, the court permitted Mr. Palaniappan to argue at length. Mr. Palaniappan conceded that his claim was based on the MOU, but he essentially argued that there were terms incorporated into the MOU that were not plainly spelled out. For example, he claimed that he was entitled to compensation for developing a business model, dealing with the City of Peoria in requesting an extension on the demolition deadline, and for other duties he performed as CFO. He stated that he would bring in evidence of his dealings with the City if the court permitted an evidentiary hearing.

He also seemed to argue that the term "funding" as required under the MOU included selling the Property, building a hospital, and then leasing it back, such that the sale to ADB fulfilled that definition. But the bankruptcy court correctly observed that none of those terms appeared in the MOU.

Ultimately, the court concluded that although the MOU met the

requirements of an enforceable contract under Arizona law,

> under the terms of [the MOU], nothing was ever performed by [Mr. Palaniappan] or Dr. Johns that would result in the payment of a severance claim greater than the dollar a month that you're entitled to under the original paragraph of [the MOU], which is unfortunate, but that's the way the agreement is written.

The court also denied Mr. Palaniappan's motion for relief from stay, finding that his claim had to be adjudicated in the bankruptcy court.

On November 6, 2018, the bankruptcy court entered an order ("Claim Order") finding that: (1) the MOU was a binding agreement; (2) the terms contained in Paragraph 1 of the MOU controlled the outcome of the severance claim; (3) Mr. Palaniappan is entitled to a claim for $1 per month from March 6, 2017, through May 2018, for a total of $15. The order required PRMC to pay Mr. Palaniappan $15 to satisfy the claim and disallowed the remainder of the claim.[3]

On November 13, 2018, Mr. Palaniappan moved for reconsideration. The bankruptcy court promptly denied the motion without a hearing. Mr. Palaniappan timely appealed, referencing only the Claim Order. He also moved for a stay pending appeal, but the bankruptcy court docket

---

[3]It is not clear why the court apparently treated the entire amount as an administrative claim, given that part of the claim was incurred pre-petition. However, no party has raised this as an issue, and the amount at issue is de minimis.

does not reflect that the matter was ever set for hearing or ruled upon.[4]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in disallowing Mr. Palaniappan's claim for severance pay.

## STANDARDS OF REVIEW

An order sustaining or overruling a claim objection "can raise legal issues (such as the proper construction of statutes and rules) which we review de novo, as well as factual issues (such as whether the facts establish compliance with particular statutes or rules), which we review for clear error." *Veal v. Am. Home Mortg. Serv., Inc. (In re Veal)*, 450 B.R. 897, 918 (9th Cir. BAP 2011) (citations omitted).

"De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014) (citations omitted).

Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous.

---

[4]Mr. Palaniappan did not appeal the denial of his motion for relief from stay.

9

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573-75 (1985).

## DISCUSSION

### A.      We need not dismiss this appeal for Mr. Palaniappan's failure to comply with applicable rules of appellate procedure.

PRMC requests that we dismiss this appeal based on Mr. Palaniappan's failure to comply with several rules of appellate procedure. Specifically, PRMC points out that Mr. Palaniappan failed to submit a coherent statement of issues or to sufficiently articulate error by the bankruptcy court to permit PRMC to respond. In addition, Mr. Palaniappan did not provide a complete record, nor did he reference the record in his opening brief. That brief does not comply with Rule 8014, as it lacks a jurisdictional statement, statement of issues and standard of review, a concise statement of the case, and a certificate of compliance, and the brief does not comply with the formatting requirements of Rule 8015, nor does it include the certificate of interested parties or related cases required by Ninth Circuit BAP Rule 8015(a)-1. Finally, PRMC notes that the brief lacks a proof of service as required by Rule 8011, and that the notice of appeal did not list PRMC or its counsel.

Pro se litigants are not excused from complying with the rules of appellate procedure. *Clinton v. Deutsche Bank Nat'l Trust Co. (In re Clinton)*, 449 B.R. 79, 83 (9th Cir. BAP 2011). And we have discretion to dismiss the appeal or summarily affirm based on these rules violations. *See N/S Corp. v.*

10

*Liberty Mut. Ins. Co.*, 127 F.3d 1145, 1146 (9th Cir. 1997) (striking appellant's brief and dismissing appeal based on numerous violations of appellate rules); *In re Clinton*, 449 B.R. at 82-83 (summarily affirming bankruptcy court's orders due to appellant's failure to file an adequate record to permit meaningful review).

But we need not dismiss this appeal. We note that Mr. Palaniappan did provide a copy of the October 25, 2018 transcript, and PRMC has provided sufficient excerpts to complete the record and permit us to review the bankruptcy court's ruling. As discussed below, more problematic is Mr. Palaniappan's failure to address exactly how he believes the bankruptcy court erred in its ruling. He instead attempts to reargue his case before this Panel, presumably in the hope that we will view the matter differently. We do not.

**B.    Mr. Palaniappan has not shown that the bankruptcy court erred in disallowing his severance claim.**

Despite Mr. Palaniappan's lengthy recitation of alleged facts regarding his relationship with PRMC and Dr. Johns, this appeal turns solely on the interpretation of the MOU Mr. Palaniappan drafted. As noted, there were two alternative severance provisions in the MOU, neither of which would be triggered unless Mr. Palaniappan or Dr. Johns secured funding for PRMC. The bankruptcy court correctly found that this condition did not occur. The sale to ADB was just that–a sale–and not the

11

procurement of financing. And the granting to PRMC of a right of first offer to rent space in the new hospital building did not transform the sale into financing, despite Mr. Palaniappan's argument that this was the "business model" employed with other hospital properties in which he and Dr. Johns had been involved.

Mr. Palaniappan agreed that his claim was based on the MOU, but his arguments were focused on matters outside the contract, such as Dr. Johns' transactions with officers of other hospitals and how those other hospitals obtained funding. Under Arizona law, however, if a contract is not reasonably susceptible to the interpretation offered by a party to the contract, that party may not introduce extrinsic evidence contradicting the written language. *Birdsell v. Fort McDowell Sand & Gravel (In re Sanner)*, 218 B.R. 941, 945 (Bankr. D. Ariz. 1998) (citing *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993)). In any event, Mr. Palaniappan's assertions are barely comprehensible, and even if they were plausible, there is no evidence that PRMC agreed to any terms other than what was contained in the MOU.

Nevertheless, Mr. Palaniappan argues that he should have been granted an evidentiary hearing and that his due process rights were violated when that did not occur. But the bankruptcy court carefully considered Mr. Palaniappan's filings and patiently permitted him to present his arguments, none of which raised any relevant issue of material

12

fact sufficient to require an evidentiary hearing regarding the interpretation of the MOU.

Mr. Palaniappan's remaining arguments on appeal are difficult to discern, but appear to be completely irrelevant to whether the bankruptcy court erred in interpreting the MOU to disallow his severance claim. As he did in the bankruptcy court, Mr. Palaniappan recites his history of working with Dr. Johns at other hospitals. He alleges that Dr. Johns used the business model Mr. Palaniappan developed to obtain a sale agreement with ADB. His argument seems to be that the definition of "funding" as used in the MOU included an investor commitment to complete the hospital, then lease it to Dr. Johns or PRMC, and that ADB is committed to doing so. But the MOU did not reflect that this was what the parties intended when executing the MOU. Moreover, as the bankruptcy court pointed out, ADB is not **committed** under the sale agreement to leasing the Property to PRMC; rather, as noted, PRMC has the right of first offer to lease space in the new building. And, as PRMC points out, the sale agreement does not **require** ADB to complete construction of a hospital at all.

Mr. Palaniappan also recites numerous tasks he performed in his capacity as CFO of PRMC and points out that he had some discussions regarding financing with an overseas investor. But, as the bankruptcy court found, the plain language of the MOU limits Mr. Palaniappan's

compensation to $1 per month "pre loan procurement" if no financing is obtained. Although this figure seems shockingly low, that is what the contract–which was drafted by Mr. Palaniappan–provides. The bankruptcy court did not err in so concluding.

Finally, Mr. Palaniappan complains that the bankruptcy court "took no time to deny his reconsideration request," but he did not include the order on reconsideration in his notice of appeal. Although this does not necessarily preclude our review of the order on reconsideration, *see United States v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756, 761-62 & n.5 (9th Cir. 1994), Mr. Palaniappan did not present any argument as to how the bankruptcy court failed to properly apply the standard for reconsideration.[5] Accordingly, we need not consider the matter. *See Jodoin v. Samayoa (In re Jodoin)*, 209 B.R. 132, 143 (9th Cir. BAP 1997) ("We 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.'" (citing *Miller v. Fairchild Indus.*, 797 F.2d 727, 738 (9th Cir. 1986))).[6]

---

[5]Reconsideration under Civil Rule 59(e), applicable via Rule 9023, is appropriate only if the moving party demonstrates (1) manifest error of fact; (2) manifest error of law; or (3) newly discovered evidence. *Hansen v. Moore (In re Hansen)*, 368 B.R. 868, 878 (9th Cir. BAP 2007) (citing *Hale v. U.S. Trustee (In re Basham)*, 208 B.R. 926, 934 (9th Cir. BAP 1997), *aff'd*, 152 F.3d 924 (9th Cir. 1998) (table).

[6]Mr. Palaniappan requests as alternative relief that we lift the automatic stay to permit him to go to state court. But we have no jurisdiction to provide this relief, even if we believed it was warranted. Moreover, to the extent he is arguing that the bankruptcy

(continued...)

14

## CONCLUSION

For these reasons, we AFFIRM.

---

court erred in denying stay relief, we have no jurisdiction over that order as it was not timely appealed.